

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00395-CV

_____

IN THE INTEREST OF S.U. AND A.H., CHILDREN

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-560860-14

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant K.U. (Mother) appeals the termination of her parental rights to her children Stephanie and Adam[2] and in which Appellant D.H. (Father) appeals the termination of his parental rights to his son Adam following a three-day bench trial.[3] In a single issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Father's court-appointed attorney filed a motion to withdraw as counsel and an *Anders* brief in support of that motion. Because sufficient evidence—including repeatedly exposing the children to domestic violence for which Mother was convicted of assault–family violence, uncontrolled mental-health issues, substance abuse, the failure to complete her service plan, and housing and employment instability—supports the trial court's best-interest finding as to Mother and because Father's appeal is frivolous, we affirm the trial court's judgment terminating Mother's parental rights to Stephanie and Adam and Father's parental rights to Adam.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). All children are referred to using aliases.

[3]Stephanie's father's parental rights were also terminated, but he did not file a notice of appeal.

## II. Factual Background

### A. Overview

The record in this case contains almost 1,700 pages and is replete with evidence of Mother's mental-health issues and Mother's and Father's criminal history, domestic-violence incidents, drug use, and lack of compliance with their service plans. However, we refrain from setting forth the details of every mental-health crisis, conviction, domestic-violence incident, drug-test result, counseling session, and visit and instead highlight some of the evidence that demonstrates that it was in the children's best interest for Mother's parental rights to be terminated.[4]

### B. Referrals in 2016

The Department of Family and Protective Services (hereinafter the Department or CPS) received a referral in January 2016 after Stephanie was in a loose car seat while Mother was driving under the influence and rolled the vehicle. Stephanie, who had not yet turned four years old, sustained bruises and bumps. Mother was later convicted for DWI with a child under age fifteen in the car and spent six months in jail.

In February 2016, Mother took eight to ten Klonopin tablets, drank half a bottle of wine, and sent a text to a neighbor about "being over the edge" while she was home alone with Stephanie and Adam. When Father and Paternal Grandmother

---

[4]Because we need not detail the evidence in Father's frivolous appeal, we include evidence about Father only when it is relevant to the best-interest ground challenged by Mother.

3

came home, Mother was trying to leave and attacked Father, grabbing his throat, trying to choke him, and pushing him into a wall. Father pushed Mother away, and she began hitting and scratching herself. She then called the police and reported that Father had caused her injuries, but Stephanie told the police that she had seen Mother hitting and scratching herself. Mother was taken to the hospital. The CPS investigator noted that the police had been involved with Mother two times in the prior year due to her suicidal ideations. Mother was ultimately convicted of assault–family violence and was sentenced to 163 days in jail. The referral was disposed of as "Reason to Believe for the Neglectful Supervision of [Stephanie] and [Adam]" by Mother.[5]

## C. Referrals in 2017

The Department received a referral in June 2017, alleging neglectful supervision and physical abuse of Stephanie and Adam by Mother, after the police responded to the home for a domestic dispute. The police report stated that Mother had strangled Father; had thrown a picture frame at Father; had thrown a phone at a picture, causing the glass in the frame to shatter; and had thrown a "kiddy" table across the room. Stephanie and Adam were present during the incident. When the CPS investigator interviewed Stephanie, she said that she and Adam had been in the room when Mother was angry and that she had seen Mother break a picture by throwing

---

[5]The record demonstrates that a Family-Based Safety Services (FBSS) case was opened based on the 2016 referrals, but the record does not disclose the details of that FBSS case.

4

her phone. Mother explained that the fight was due to Father's abuse of Xanax, but she also reported that she had been diagnosed with several mental-health issues and was not taking any medication. Mother was arrested and charged with assault–family violence for impeding Father's breath or circulation and was placed on deferred-adjudication community supervision for five years.

In August 2017, CPS received a referral alleging neglectful supervision of Stephanie because Mother and her paramour had gotten into a fight over her use of pills and alcohol. The referral also stated that Mother had broken into a neighbor's home and that there was concern that Mother had taught her children how to climb through the neighbor's window and steal from the home. The referral was disposed of as "Reason to Believe – Neglectful Supervision of [Stephanie] and [Adam] by [Mother]."

## D. FBSS Case Opened

After receiving the above referrals during 2017, the Department opened an FBSS case and gave Father and Mother service plans. Father and Mother, however, failed to complete anything on their FBSS service plans from August 2017 to February 2018. Father and Mother failed to take more than three requested drug tests, and each refused drug test was counted as a positive test.

Due to Father and Mother's refusal to work their FBSS service plans to alleviate the Department's concerns about the children's safety in the home, the FBSS supervisor recommended that the children be removed from the home. She

5

explained that it was not safe for the children to remain in the home because of the parents' criminal history, concerns of family violence, and continued drug use as reflected by their repeated failures to take requested drug tests.

## E. CPS Case Opened

In February 2018, CPS removed Stephanie and Adam from the home[6] and placed them in foster care due to concerns that Father and Mother had engaged in domestic violence in front of the children, that both parents were abusing substances, and that Mother had untreated or improperly medicated mental-health issues.

### 1. Mother's Service Plan Compliance

As part of the CPS case, Mother received a service plan that required her to undergo a psychological evaluation and a drug and alcohol assessment; to attend individual counseling and parenting classes; to submit to drug testing; to attend visitation; and to maintain consistent contact with her CPS worker, safe and stable housing, and stable employment. Mother's drug and alcohol assessment recommended that she take classes through Community Addiction Treatment Services (CATS). Mother failed to complete her services because she was never successfully discharged from counseling and did not successfully complete CATS. The following paragraphs set forth Mother's compliance with random drug testing,

---

[6]Father was in jail for possession when the children were removed and was released in October or November 2018.

detail her parenting ability, summarize what occurred during several of the visits, and show Mother's employment and housing history.

### a. Drug Testing

Mother was "sporadically compliant with random drug testing." During the first year of the CPS case (from February 2018 to February 2019), Mother failed to comply with at least five requests for random drug testing—all of which were presumed positive.

Mother's drug test in February 2019 came back as diluted; Mother told the Court-Appointed Special Advocate (CASA) volunteer that she knew how to dilute drug tests and that Father had purchased urine to use in a test.

Mother tested positive for marijuana on a March 1, 2019 urinalysis. Mother said that she had taken a "hit" from a friend's vape pen and believed that it had marijuana in it but did not know for sure.

Mother tested positive for barbiturates on a urinalysis in July 2019. Mother gave CPS documentation showing that she had a prescription for clonazepam that was filled in June 2019.

The latter conservatorship worker[7] testified that the longest period of time that Mother had produced only clean drug tests was four months.

---

[7]Throughout the opinion, we use the designations "initial conservatorship worker" and "latter conservatorship worker" in lieu of their names. The initial conservatorship worker handled the case from February 2018 to February 2019. The latter conservatorship worker handled the case from February 2019 through the time

### b. Parenting

Mother initially testified that she had never put her children in danger. She later acknowledged that she had been violent towards Father, that he had been violent towards her, and that he had drug issues and a long criminal history related to drugs. She agreed that it was not safe for the children to be in an environment where there was family violence or to be around someone who was constantly using drugs and going to jail. Mother also admitted that it was traumatic for the children to be in the same house where they could hear incidents involving domestic violence.

Mother believed that she could 100 percent protect the children now that she was "much more heightened and aware." Mother said that she had promised herself that she would never put her children through what she went through as a child but that she had failed. Mother testified that she never wanted to hurt her children again. When asked what was going to stop this from happening again, Mother responded, "Experience." Mother opined that the trial court could rely on her experience.

### c. Visits

Mother interacted well with the children during her visits and required very little redirection. She always brought something for the children to eat, as well as games or books; engaged with the children; and helped them complete their homework during the school year.

---

of the termination trial, which was held on August 8, 2019; September 26, 2019; and October 1, 2019.

There were three visits when the person contracted to observe the visits saw concerning behavior from Mother. At one visit, Mother slurred her words, had glassy eyes, and was shaking; Mother said that she had suffered an anxiety attack before the visit, had taken medication, and would feel better after she ate. At another visit, Mother took Stephanie to the bathroom and let her FaceTime with Father even though the trial court had ceased allowing visits and contact between Father and Stephanie at that point. At a visit near the time of the termination trial, Mother took no action to protect the children when Father showed up at Taco Cabana while she was visiting with the children, "got out of the car[,] and motioned the children to come to him" while yelling, "I don't give a F what you guys say, I didn't get to see my kids on Father's Day; I didn't get any F'ing gifts, and I'm going to see my kids."

The visit observer and the latter conservatorship worker said that the children get excited when they see Mother and that they are very bonded with her. But the visit observer also noted that the children are happy to see their foster parents when they come to pick them up.

### d. Employment

Mother did not have six months of consistent employment. At the time of the termination trial, Mother testified that she had been working at a restaurant for approximately two months.

### e. Housing

During the year and a half that the CPS case was pending, Mother had not established stability in housing. Rather, Mother "moved quite a bit"; she lived with various relatives, at Union Gospel Mission, and with Father before moving to the Salvation Army in July 2019 to be in the START Program.[8]

## 2. Continued Domestic Violence

While Mother was working her CPS service plan, she and Father continued to engage in domestic-violence incidents. In March 2019, Mother found drugs in the gas cap area of Father's vehicle, and either Mother or Paternal Grandmother flushed the drugs down the toilet. After Mother found the drugs, Father and Mother went to a visit with the children and then returned home, where they yelled at each other and Father pushed Mother and Paternal Grandmother. Father then locked himself in the bedroom with their baby Heather.[9] Mother called the visit observer, who came to the apartment and found Mother who was "red in several spaces." The visit observer told Father to open the door and give her Heather. Father said that Heather was fine but that he had a gun in his closet and would kill himself. After the visit observer threatened to kick the door down, Father opened the door, and the visit observer

---

[8]The START Program is a six-month program that requires participants to obtain employment and to save their money to be able to rent an apartment and become self-sufficient. The Salvation Army also offers a Family START Program, which is a year-long program for those with children.

[9]A third child, whom we refer to as Heather, was born in December 2018.

retrieved Heather from the bassinet. Later that month, Heather was placed outside the home.[10]

In July 2019, after Mother had moved to the Salvation Army, she went back to Father's apartment to retrieve her belongings. Father and Mother began arguing, and Father grabbed her arm and tried to break her phone. Police responded to the family disturbance but did not arrest either parent because they could not verify that anything more than a verbal altercation had occurred.

### 3. Mother's Mental-Health Struggles

Mother's mental-health issues continued during the CPS case. The record demonstrates that Mother had been diagnosed with bipolar disorder, panic disorder, posttraumatic stress disorder (PTSD), anxiolytic use disorder, cannabis use disorder, and borderline personality disorder.[11] Mother admitted that she had self-harmed by cutting her legs with a razor during the children's lifetime and that she had cut her wrists at sixteen. Father and Paternal Grandmother told CPS that in January 2018, Mother had tried to kill herself with a pair of scissors. Mother explained that she had been hospitalized "a lot" and that she had often turned herself in to get help. Mother

---

[10]Heather was added to this termination suit in March 2019, but her case was later severed into a separate suit that was not tried with this case.

[11]Mother's testimony about her mental-health diagnoses differed from that found in the clerk's record. She testified that she had major depressive disorder, severe anxiety disorder, PTSD, insomnia, and borderline personality disorder; she denied having told anyone that she had bipolar disorder.

11

said that the most recent time that she had turned herself in for help was following a hearing in this case in June 2019.

After the hearing, Mother reached out to her conservatorship worker and asked her to take her to the hospital due to her mental health. Mother said that she and Father had engaged in a physical domestic altercation, that she had never seen him like that before, that he was withholding her medication and had taken her phone, and that she had no place to go. Mother's conservatorship worker took her to the hospital.

Mother then spent ten days in Trinity Springs and twenty-five days in the MHMR Crisis Residential Unit (CRU) before going to live at the Salvation Army. Mother explained that she had entered those programs because she was "feeling down and off" and wanted to go to the hospital so that doctors could "monitor [her] on new or adjusted medication." Mother testified that at the time of the termination trial, she was taking one medication for depression, two medications for anxiety, and one medication for sleep.

### 4. Mother and Father's Relationship

Throughout Mother and Father's interactions with the Department, they had a pattern of saying that they needed to end their relationship. At trial, Mother testified that she was no longer in a relationship with Father and that they had ended their relationship on June 4, 2019. Mother explained that she did not leave Father until June 2019—three months after the incident when Father assaulted Mother after she

had found drugs in his vehicle's gas cap compartment—because she was raised by two addicts in an abusive environment and that abuse was how she accepted love. Mother testified that she had ended her relationship with Father because she was done and "couldn't deal with it anymore." When asked how she knew that she would not go back to Father, Mother said that she could not put her children through that because she had "seen from testimonies about how it ha[d] affected" them. Mother admitted that she had known that previously but had not been able to make the change.

Mother testified that she had seen Father twice between June 2019 and September 26, 2019: once when she went to his apartment to retrieve her belongings and another time when they went on a road trip to his grandmother's funeral in Utah.[12] Mother claimed that she planned to file for divorce; she explained that she had filled out divorce paperwork but had not filed it because she did not know whether to file with or without children due to the children's being in CPS's care.

The CASA volunteer opined that Mother and Father were still engaged in a relationship at the time of the termination trial because Father had visited Mother while she was in Trinity Springs and at CRU and because they had indicated to her that they saw and communicated with each other regularly. The CASA volunteer said that Father wanted the relationship to work out but that Mother did not. It worried

---

[12]Mother did not tell her conservatorship worker that she went to Utah with Father; instead, Mother told her that she was sick and had to cancel her visit. Mother went on the trip with Father despite having informed her conservatorship worker just a few months prior that she believed that Father was using drugs.

13

the CASA volunteer that Father and Mother were still engaged in a relationship with each other because she did not think it was a safe environment for the parents or for the children due to the arguments and physical fights that they had a tendency to engage in.

### 5. The Children's Condition

The latter conservatorship worker testified that Stephanie and Adam need love, stability, and consistency; that they need to have their basic needs met; and that they need to feel that they are safe. The initial conservatorship worker testified that when the children came into the Department's care, they exhibited "a lot of separation anxiety" and that Adam was underweight and had ten or eleven cavities. After Adam's cavities were filled, he made progress with gaining weight because he was able to eat more types of food and in higher quantities.

The children's therapist testified that initially, both children were "very closed" and would not express emotions. Based on their "initial closure," the children's therapist believed that Stephanie and Adam had experienced trauma. It took many months of the therapist meeting with Stephanie to gain her trust so that she would discuss what she had witnessed. Stephanie disclosed that Mother had harmed Father, that there was yelling in the home, and that she was fearful in Mother and Father's home. Over time, Stephanie had changed to "being very open, very free in play, able to self-identify her emotions, [and] able to implement coping strategies and things like[] that." The children's therapist said that the children had blossomed since she

14

had started seeing them, that the children were stable, and that they had expressed happiness.

The CASA volunteer and the latter conservatorship worker testified that the children were flourishing at the time of the termination trial. Adam was in pre-K at a Montessori school, was intellectually on target, and was "doing very well." Adam was above level developmentally but might need speech therapy. Adam was receiving individual therapy once a week in the home for an hour and fifteen minutes. Stephanie was "doing amazing in school," was "very brilliant," and was above level developmentally. Stephanie was receiving individual therapy and behavioral therapy.

Although Stephanie had initially referred to her foster parents as Mama S. and Daddy D., approximately six months before trial, she had started referring to her foster parents as Mom and Dad and referred to Mother as Mama K. In January 2019, Stephanie told her therapist that she wanted everybody—her foster parents and Mother—to live with her. But since then, Stephanie had focused more on her foster parents. The visit observer heard the children say, "[They] want[ed] to be with [their] foster parents, but [they would] never see [Mother] again, but [they were] happy over here [with their foster parents]." The children's therapist opined that Stephanie's desire to live with her foster parents was a reaction to her feeling more stable.

## 6. The Foster Parents

The initial conservatorship worker testified that the foster parents "are incredibly involved" in the children's lives, as shown by their commitment to the

15

children's medical care and to making sure the children are involved in extracurricular activities. The initial conservatorship worker explained that the foster parents are very aware of the children's likes and dislikes and are concerned about the way the children are feeling. Both conservatorship workers opined that the foster home that the children were in would provide a safe and stable placement for them and that the foster parents were able to meet the children's physical, emotional, and financial needs now and in the future.

### 7. The Future Plans for the Children

Mother, the conservatorship workers, and Foster Mom testified regarding their plans for the children. If the children were returned to Mother, Mother said that all of the services at the Salvation Army were available to her to assist her with caring for her children. Her plan was to move from the Salvation Army's START Program to the family program, to graduate from that program, and to get her own housing. Mother's immediate plan was to stay at her current job and work full-time; her long-term plan was to go back to school. Mother did not say what her backup plan would be if the children were returned to her and she had to go to the hospital for her mental-health issues.

The conservatorship workers testified that the Department's plan was for the children to be adopted by their foster parents.

Foster Mom testified that her desire for Stephanie's and Adam's futures was for them to be in a stable, loving home. If the trial court terminated Mother's and

Father's parental rights, Foster Mom requested that CPS be named managing conservator to facilitate a potential adoption.

### 8. Recommendations

Mother, the conservatorship workers, and the children's ad litem made recommendations to the trial court regarding whether to terminate Mother's parental rights.

Mother asked the trial court to return her children. Mother testified that she had seen the children for four hours each week during all of 2019 and opined that the children would be adversely affected if they were no longer able to see her. Mother testified that through the CPS case, she had become more aware of her issues, that she knew her triggers, and that she knew how to handle them. She said that she had left the abusive situation that she was in with Father, that she had obtained a job, that she was in a program at the Salvation Army, and that she was attending Narcotics Anonymous (NA) three times a week.

The initial conservatorship worker opined that the children should not be returned to their parents because the parents had continued to engage in the same pattern of behavior with their drug use and to engage in a relationship with someone who had committed domestic violence against them. The initial conservatorship worker asked the trial court to terminate the parents' parental rights to Stephanie and to Adam and opined that termination would be in the children's best interest because it is important for children "to have a safe and stable environment . . . where there

aren't concerns of past drug use with the parents[] [and] that there aren't concerns for domestic violence with the parents."

The latter conservatorship worker testified that the Department was asking the trial court to terminate Mother's and Father's parental rights to the children and opined that termination would be in the children's best interest. The latter conservatorship worker said that Father and Mother were not able to meet the children's needs. The latter conservatorship worker testified that the children should not be returned to Mother because there had been a continual behavior pattern of her saying that she wanted to make changes but had not done so. The latter conservatorship worker explained that Mother had continued to engage in a relationship with Father even though she had reported that she knew he was using drugs, she had continued to engage in domestic violence with Father while Heather was in her care, she had not completed her services, she had not provided proof of consistent employment or housing, and she had continued to test positive for drugs.

The children's ad litem stated that Mother had put in a lot of effort and had a bond with the children. But the children's ad litem was concerned about Mother's "relationship with [Father]. We have had indications we were going to stop it. It always comes back. I have no confidence that it won't come back again. I think these children are going to remain at risk into the future because that relationship can't and has not ever been demonstrated to be over with." The children's ad litem opined that it was not in the children's best interest for Mother to maintain her parental rights.

18

## F. Outcome

After hearing the evidence during the three-day bench trial, the trial court found by clear and convincing evidence that Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that had endangered the children's physical or emotional well-being, had engaged in conduct or had knowingly placed the children with persons who had engaged in conduct that had endangered the children's physical or emotional well-being, and had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children, and that it was in the children's best interest for Mother's parental rights to be terminated. The trial court also found by clear and convincing evidence that Father had knowingly placed or had knowingly allowed Adam to remain in conditions or surroundings that had endangered his physical or emotional well-being, had engaged in conduct or had knowingly placed Adam with persons who had engaged in conduct that had endangered his physical or emotional well-being, had constructively abandoned Adam, and had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of Adam, and that it was in Adam's best interest for Father's parental rights to be terminated. Mother and Father then perfected these appeals.

19

### III. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. Mother's Appeal

In her sole issue, Mother argues that the evidence is legally and factually insufficient to prove that termination of her parental rights was in the children's best interest.

### A. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be

21

the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89

S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the

evidence in light of nonexclusive factors that the factfinder may apply in determining

the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*,

402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and

some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Indeed,

undisputed evidence of just one factor may be sufficient to support a finding that

termination is in the child's best interest. *Id.* On the other hand, the presence of

scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

With regard to the children's desires, Stephanie and Adam did not testify at trial. The record contains evidence that the children were bonded to Mother and to their foster parents. Although Stephanie had expressed concern over never seeing Mother again, she had started calling her foster parents Mom and Dad and had said that she was happy living with them. The trial court was entitled to find that this factor weighed slightly in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to the children's emotional and physical needs now and in the future, the record reflects that the children's basic needs include food, shelter, and clothing; routine medical and dental care; safe, stimulating, and nurturing home environments; and friendships and recreational activities appropriate to their ages. Although Mother had moved out of Father's apartment in June and had obtained safe and appropriate housing at the Salvation Army in July, her ability to consistently provide for Stephanie's and Adam's emotional and physical needs now and in the future remained in doubt due to her having obtained employment and safe housing only the month before the termination trial began. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to the emotional and physical danger to the children now and in the future, the record demonstrates that Mother's domestic-violence incidents with

Father had traumatized Stephanie and Adam and had made them fearful to be in the home with Mother and Father. Mother's failure to abstain from using drugs during the case and her failure to complete her services to address her drug use posed a danger to the children, as did her numerous hospitalizations to deal with her mental-health issues. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to Mother's parenting abilities, the evidence showed that she needed little redirection during the visits but that she was unavailable to parent her children during her numerous mental-health hospitalizations and while she was in jail for assaulting Father. Mother had made numerous poor parenting choices when she engaged in domestic violence in front of the children, drove while under the influence while Stephanie was in the vehicle, and used drugs before and during the CPS case. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to the programs available to assist Mother to promote the children's best interest, the record demonstrates that Mother worked most of the services on her service plan but did not fully address the underlying issues that triggered the removal because she had failed to be successfully discharged from counseling and CATS. Mother had, however, enrolled in the Salvation Army's START Program the month before trial, was attending NA, and planned to utilize the services at the Salvation Army to assist her with caring for her children if the trial

24

court returned them to her. The trial court was entitled to find that this factor weighed neither for nor against terminating Mother's parental rights to Stephanie and Adam.

With regard to the plans for the children and the stability of the proposed placement, Mother requested that the trial court return her children to her and that she would immediately transfer to the Family START Program at the Salvation Army, utilize the programs there to assist her with raising her children, and continue working her job at the restaurant until she could go back to school. But Mother had failed to have clean, undiluted drug-test results for longer than four months during the case, had obtained employment and safe housing only the month prior to the start of the trial, and had not expressed a plan for how she would care for the children if she were hospitalized in the future for mental-health issues. The Department planned for the children to be adopted by their foster parents, who had cared for them since they were removed from Mother in February 2018 and who had shown the ability to provide a safe and stable placement for them. The trial court was entitled to find that the plans-for-the-children factor weighed neither for nor against termination and that the stability factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to Mother's acts or omissions that may indicate that the existing parent–child relationship is not a proper one, the analysis set forth above—which details Mother's willingness to expose the children to domestic violence, her

continued contact with Father despite their volatile interactions and her knowledge that he was using drugs, her failure to maintain consistent employment and safe housing, her numerous hospitalizations for her mental-health issues, her positive drug tests during the case, as well as her failure to take advantage of the services that she was offered—reveals that the existing parent–child relationship between Mother and the children is not a proper parent–child relationship. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

With regard to any excuse for Mother's acts, she blamed Father for the domestic violence incidents in 2017 that led to the children's removal; she did not accept any responsibility for her violent behavior. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Stephanie and Adam.

After reviewing all the evidence, applying the appropriate standards of review, and deferring to the factfinder's credibility determinations, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and the children was in the children's best interest. We therefore hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial

26

court's best-interest finding when most of the best-interest factors weighed in favor of termination); *In re D.R.T.*, No. 02-11-00213-CV, 2012 WL 1868535, at *1–14, *18 (Tex. App.—Fort Worth May 24, 2012, no pet.) (mem. op.) (holding evidence sufficient to support best-interest finding when record reflected that the mother not only failed to recognize how she had endangered her children through the domestic violence in her relationship with her paramour but also failed to complete her CPS service plan and failed to find stable housing and employment in contrast to other evidence showing that the children had stable, healthy homes away from her and that their caregivers had appropriate and protective plans for the children); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam) (noting that "[s]tability and permanence are paramount in the upbringing of a child" and affirming a finding that termination was in a child's best interest when the child showed improvement in foster care); *In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best-interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care).

We overrule Mother's sole issue.

## V.  Father's Appeal

Father's court-appointed appellate attorney filed a motion to withdraw as counsel and a brief in support of that motion, averring that after diligently reviewing

the record, she believes that the appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Father did not file a response. The Department filed a letter stating that it would not be submitting a response to the *Anders* brief.

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.).

Having carefully reviewed the record and the *Anders* brief, we agree that Father's appeal is frivolous. We find nothing in the record that might arguably support Father's appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005). But we deny the motion to withdraw because it does not show "good cause" separate and apart from its accurate determination that there are no arguable grounds

for appeal. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order); *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied).[13]

## VI. Conclusion

Having overruled Mother's sole issue, having held that nothing in the record might arguably support Father's appeal, and having denied Father's court-appointed attorney's motion to withdraw, we affirm the trial court's judgment terminating Mother's parental rights to Stephanie and Adam and Father's parental rights to Adam.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 23, 2020

---

[13]"[A]ppointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *P.M.*, 520 S.W.3d at 27–28.